UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-20633-CIV-ALTONAGA/Reid

**BROOKE GOLDSTEIN**,

    Petitioner,
v.

**MATTHEW SIMON**,

    Respondent.
_____/

## ORDER

**THIS CAUSE** came before the Court on Petitioner, Brooke Goldstein's Verified Petition for Return of the Children to Israel [ECF No. 1], filed on February 19, 2024. The Court held an initial hearing on February 29, 2024 (*see* Feb. 29, 2024 Hearing [ECF No. 13]), followed by an evidentiary hearing drawn out over three weeks (*see* May 13, 2024 Hearing [ECF No. 49]; May 15, 2024 Hearing [ECF No. 53]; June 3, 2024 Hearing [ECF No. 59]; June 4, 2024 Hearing [ECF No. 60]).[1] Having carefully considered the Petition, the record and evidence presented, arguments from counsel, and applicable law, the Court concludes the Petition must be denied.

### I.    INTRODUCTION

"While child custody battles are all too common, it is not often that one of them finds its way into the federal courts." *Pielage v. McConnell*, 516 F.3d 1282, 1283 (11th Cir. 2008). Petitioner invokes the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention") and its corresponding United States statute, the International Child

---

[1] Typically, a petition like this one is addressed expeditiously — within six weeks of the petition's filing. *See Chafin v. Chafin*, 742 F.3d 934, 936–37 (11th Cir. 2013); S.D. Fla. Internal Operating Proc. § 2.18.00. Here, the parties turned down the Court's repeated offers of earlier and more streamlined dates for an evidentiary hearing.

Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 *et seq.*; and seeks an order directing the return of the parties' three minor children ("the Children") to Israel. (*See* Pet. 1).[2]

The Hague Convention is meant to protect children from both wrongful removals and wrongful retentions by a parent. *See* Hague Convention, Preamble. It was created "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access[.]" *Id.* (alteration added). This case involves only an alleged wrongful retention, not removal. (*See generally* Pet.). In response to the Petition, Respondent denies the claim of wrongful retention, denies Israel is the Children's habitual residence, and raises several affirmative defenses. (*See* Verified Ans. & Aff. Defenses [ECF No. 29]).

The Convention was designed to "'restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court.'" *Lops v. Lops*, 140 F.3d 927, 936 (11th Cir. 1998) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996)). "The underlying premise of the Hague Convention is that a child's country of 'habitual residence' is the place where questions of custody and access are best decided." *Bocquet v. Ouzid*, 225 F. Supp. 2d 1337, 1340 (S.D. Fla. 2002) (citations omitted). Therefore, a court considering an ICARA petition has jurisdiction over the wrongful removal or retention claim but not the underlying custody dispute. *See Lops*, 140 F.3d at 936.

To establish a prima facie case of wrongful retention under the Hague Convention, a

---

[2] "The United States and Israel are both signatories to the Hague Convention." *Bekier v. Bekier*, 248 F.3d 1051, 1052 n.1 (11th Cir. 2001) (citation omitted), *abrogated on other grounds by Chafin v. Chafin*, 568 U.S. 165 (2013).

petitioner must show by a preponderance of the evidence that: (1) the child or children's habitual residence immediately before the allegedly wrongful retention was in a foreign country; (2) the retention was in breach of custody rights under the foreign country's law; and (3) the petitioner was exercising custody rights at the time of the wrongful retention. *See Bocquet*, 225 F. Supp. 2d at 1340 (citations omitted). A respondent who objects to the child's return may establish an affirmative defense by a preponderance of the evidence. *See Crespo Rivero v. Carolina Godoy*, No. 18-23087-Civ, 2018 WL 7577757, at *2 & n.1 (S.D. Fla. Oct. 12, 2018). There are five potential affirmative defenses, which are narrowly construed:

> 1) the child is now settled in the new environment; 2) the person in the care of the child was not actually exercising custody rights at the time of removal, or subsequently consented to or acquiesced in the removal; 3) the child objects to the return and is mature enough to have their [sic] objection considered; 4) there is a grave risk that return would expose the child to physical or psychological harm or otherwise intolerable situation; or 5) the return of the child would not be permitted under the fundamental principles of the requested state relating to the protection of human rights and fundamental freedoms.

*Id.* at *2 (footnote call number and citations omitted).

## II. FINDINGS OF FACT

"This is an unusual Hague Convention and ICARA case. Most of them involve the non-custodial parent removing the child from the custodial parent or retaining the child after a permitted visitation period has ended." *Pielage*, 516 F.3d at 1287 (collecting cases). By contrast, the parties in this case are still legally married, and until recently — and for many weeks after the Petition was filed — lived together with their Children in one house.[3] Presently, the parties live separately in Miami, and the Children reside with Petitioner. The parties have reached an impasse on the

---

[3] Weeks after she filed the Petition, in April 2024, Petitioner filed a petition for a domestic violence injunction against Respondent in state court; the ensuing restraining order required Respondent to leave the family home. Respondent denies the domestic violence allegations.

3

question of whether and when the family should leave the United States and return to Israel.

The Court first recounts the uncontested facts and then explains why it finds Respondent's version of events more credible as to material, contested facts relevant to Petitioner's prima facie case. Given its conclusion regarding the prima facie case, the Court does not address Respondent's affirmative defenses.

*Uncontested facts.* In happier times, Respondent and Petitioner were married in New York. They have three children: W.S., born in 2015; B.S., born in 2017; and Z.S., born in 2020. All the Children were born in New York.

The family has a significant amount of wealth and a relatively transitory existence. Petitioner, an attorney, testified that the professional organization she founded is based in New York, although it now also has a rented office in Tel Aviv, Israel. Respondent, who graduated from law school, explained he works in part for his family business and spends time at home with the Children.

Neither parent's career appears tied to a single place. Prior to 2020, the family spent time residing in Brooklyn, the Hamptons, and Los Angeles; each move was interspersed with frequent domestic and international travel. In December 2020, Respondent and Petitioner decided to move to Israel. By mid-2021, the parties and the Children had become Israeli citizens and obtained Israeli passports.

Notwithstanding their frequent travels, the parties signed a long-term residential lease in Herzliya, Israel, that runs through September 2024. The parties also engaged in discussions regarding amending the lease and extending it to 2026 or 2027; these discussions were in-depth enough that their landlord sent them a draft lease addendum. The parties opened Israeli bank accounts and had Israeli cell phones. The Children saw doctors and therapists, were enrolled in

school and extracurricular activities, and had multiple nannies while in Israel. The family joined a local synagogue.

The family shipped furniture and bicycles for the Children to Israel, and in 2023, Respondent sold his Southampton home — the family's only remaining residence in the United States at the time. Still, the parties maintained belongings in storage units and cars (which the family still own) in the United States and filed taxes in the United States. The family also kept U.S. health insurance despite receiving state healthcare in Israel.

On October 7, 2023, Israel was brutally attacked. At the time, the family was vacationing in Italy, and the airline canceled their pre-booked return flight to Israel. After spending a few days in Rome, Respondent and Petitioner agreed to relocate to Miami until the war in Israel was over; indeed, Respondent presented a letter from Petitioner's Israeli lawyer[4] stating Petitioner agreed to sign a lease in Miami for at least six months to one year. At the time she filed the Petition, the family had been living in Miami for approximately four months — short of the "six-months-to-one-year or until-the-war-is-over" period Petitioner had agreed to.

From their arrival in October 2023 to the filing of the Petition, the Children were enrolled in and attended school, participated in extracurricular activities, saw doctors and therapists, and spent time with nearby friends and the parties' extended family. The Children are enrolled in school for the 2024–2025 schoolyear in both Miami and Israel.

***Contested facts.*** The parties disagree about their intentions in leaving New York and moving to Israel. The move was, at least initially, motivated by a desire to be somewhere both

---

[4] According to Respondent, Petitioner filed, then withdrew, divorce proceedings in Israel in April or May of 2023. In June 2023, Petitioner also filed an action under the Hague Convention seeking to have Israel declared the Children's ordinary place of residence.

5

warmer and more open than New York was during the Covid-19 pandemic. Petitioner claims the move was always meant to be permanent, explaining that it fulfilled her dream of spending time in Israel.

Respondent, disagrees with the permanency description, explaining the move was merely a "Covid sabbatical." He also noted it had been his wish to try living in Los Angeles, which the family also did previously. To this point, Respondent presented an email he sent Petitioner in 2021 stating that he only wanted to "try" living in Israel for one to two years. The parties ultimately remained in Israel longer than that — approximately two years and ten months — although not all this time was spent in Israel: the family vacationed a summer in Spain, a summer in New York, and took many shorter trips throughout their time abroad.

Against this backdrop, Petitioner says she would like the family to go to Israel immediately — well, to be clear, to go with the Children to Israel and then return to the United States shortly thereafter so the Children may participate in their planned summer camps in the northeast — and Respondent is preventing her from doing so. Respondent states that he has simply expressed a preference that the family does not return to Israel at the present time, and he and Petitioner are unable to come to an agreement. He asserts there has been no wrongful retention, as he has never prevented Petitioner from going to Israel with the Children.

The Court finds Respondent's version of events more credible. For example, in the Verified Petition, Petitioner alleged "[t]he parties originally had return tickets to Israel scheduled for February 2024, which were rescheduled for March 2024." (Pet. ¶ 17 (alteration added)). At the motion-to-dismiss stage, the Court accepted this allegation as true. (*See generally* Apr. 2, 2024

Order [ECF No. 27]).[5] The evidence did not bear this claim out, however. The parties' travel agent testified that, while he booked Israel-bound airline tickets for Petitioner and the Children, at the time of the Petition's filing, Petitioner had not actually paid the travel agent for those tickets.

Further, the travel agent testified that Respondent did not know about the tickets to Israel; indeed, Petitioner explicitly instructed the agent not to tell Respondent about the tickets, even when Respondent directly inquired. Petitioner testified that she verbally told Respondent she booked tickets to Israel through the travel agent, but she did not produce any corroborating evidence showing Respondent was aware of the tickets. The undersigned views her claim that she told Respondent of the tickets with some skepticism, especially given Respondent's credible testimony and the litany of other decisions and disagreements between the parties that Petitioner *did* document via emails and WhatsApp messages. In any event, Petitioner admitted on cross-examination that Respondent never cancelled tickets to Israel prior to the filing of her Verified Petition.

Petitioner also stated in her affidavit supporting her Opposition to Respondent's Motion to Dismiss ("Goldstein Aff.") [ECF No. 23-1] that Respondent "almost depleted [the parties'] United States joint bank account and cancelled [Petitioner's] credit card in the United States." (*Id.* ¶ 59 (alterations added)). Cutting off her access to these funds, she claimed, prevented her from purchasing airline tickets to Israel or paying rent on their home in Israel. (*See id.*). Again, the Court took this allegation as true at the motion-to-dismiss stage. (*See generally* Apr. 2, 2024 Order).

---

[5] Although dispositive pre-trial motions are not customarily filed in expedited cases brought under the Hague Petition, Respondent filed a combined Motion to Dismiss and Motion for Summary Judgment [ECF No. 15], to which Petitioner filed a Response in Opposition [ECF No. 23]. The Court denied the Motion on April 2, 2024. (*See generally* Apr. 2, 2024 Order).

Once more, this assertion was not borne out by the evidence produced at the hearings. Respondent showed that Petitioner receives a yearly salary of $300,000 and has her own, individually held credit card, bank account, and sizeable investment account.[6] Petitioner did not present any evidence rebutting this information, nor did she show she was unable to afford plane tickets with her own funds.

Respondent highlighted the opportunities Petitioner had to return to Israel with the Children as evidence that he was not preventing her from leaving the United States with them. His unrebutted testimony was that the Children's passports were in the family's shared home in Miami until Petitioner gave them to her parents.[7] Additionally, Respondent notes that he traveled to Houston, Texas in January 2024, leaving Petitioner alone with the Children in Miami and with ample opportunity for her to travel with the Children to Israel. Notably, the day after Respondent returned to Miami, Petitioner left on a trip to Israel by herself.

Petitioner explained she did not bring the Children with her on her January trip to Israel because she believed she was required to have a letter of consent from Respondent. Although Petitioner stated she did not think Respondent would have given consent, she never produced any evidence that he refused to provide a letter of consent, or that she even asked for such a document. To the contrary, the Court heard unrebutted testimony from Respondent's legal expert that a sole Israeli-citizen parent can travel to Israel with her Israeli-citizen children without a letter of consent from the non-traveling parent. In fact, Petitioner's own legal expert testified that if the Children's habitual residence was in Israel, Petitioner did not need Respondent's consent to return with the

---

[6] Because the parties testified that Respondent covers most of the family's household expenses, Petitioner presumably has full access to these funds.

[7] The Children have American and Israeli passports. After the Petition was filed, the Children's passports were given to the United States Marshal. (*See* Show Cause Order [ECF No. 6] 2).

8

Children. The Court credits the unrebutted testimony of the parties' legal experts.

Finally, Respondent posits that the situation in Israel is too dangerous for the Children to return. He argues that if the Children are forced to return, they will be at serious physical and psychological risk. In support of this affirmative defense, Respondent presented expert testimony that the war in Israel is ongoing, and due to the country's small size, no area is, in the expert's opinion, truly safe. Petitioner disagrees, arguing many of the parties' friends have returned to Israel; schools, shops, and restaurants are open; and life in Herzliya has largely returned to normal. Petitioner's contentions are undercut, however, by her own actions. In April of this year, Petitioner was scheduled to return to Israel but cancelled her trip when Iran launched missiles in Israel.[8]

### III. CONCLUSIONS OF LAW

With that, the Court turns to the legal requirements of Petitioner's prima facie case. Two of the elements Petitioner must prove are in dispute: the Children's habitual residence, and whether there was a wrongful retention. The Court finds that the Children's habitual residence was not Israel when Petitioner filed her Petition, and, in any event, there was no wrongful retention. Because Petitioner has not established a prima facie case, the Court does not address Respondent's affirmative defenses, other than to note Respondent has a genuine concern that there is a grave risk that return to Israel now will expose the Children to physical or psychological harm or an otherwise intolerable situation because of the ongoing war.

***Habitual residence.*** The determination of habitual residence is a mixed question of fact and law — "albeit barely so." *Monasky v. Taglieri*, 589 U.S. 68, 84 (2020). "The inquiry begins with a legal question: What is the appropriate standard for habitual residence?" *Id*. The

---

[8] Additionally, further damaging Petitioner's credibility, the head of the Children's Israeli school testified that none of his children attend school in Israel, but are rather living and attending school the U.K.

9

"governing" standard is a "totality-of-the-circumstances" test. *Id.* "Once the trial court correctly identifies" that standard, however, "what remains for the court . . . is to answer a factual question: Was the child at home in the particular country at issue?" *Id.* (alteration added; citation omitted).

The bulk of the analysis, therefore, is a "fact-driven inquiry, [and] courts must be sensitive to the unique circumstances of the case and informed by common sense." *Id.* at 78 (alteration added; citation and quotation marks omitted); *see also id.* at 84 ("The habitual-residence determination thus presents a task for factfinding courts[.]" (alteration added)).

As the Supreme Court has explained:

> Facts courts have considered include: "a change in geography combined with the passage of an appreciable period of time," "age of the child," "immigration status of child and parent," "academic activities," "social engagements," "participation in sports programs and excursions," "meaningful connections with the people and places in the child's new country," "language proficiency," and "location of personal belongings."

*Id.* at 78 n.3 (citation omitted).

Importantly, however, "[n]o single fact [] is dispositive across all cases." *Id.* at 78 (alterations added). Rather, "a child's habitual residence depends on the particular circumstances of each case[.]" *Id.* at 79 (alteration added). This flexibility is needed to accomplish the Hague Convention's "aim: to ensure that custody is adjudicated in what is presumptively the most appropriate forum — the country where the child is at home." *Id.* Again, Petitioner bears the burden of establishing the habitual residence by a preponderance of the evidence. *See Bocquet*, 225 F. Supp. 2d at 1340.

Much of the evidence produced at the hearings focused on whether the Children's habitual residence was, at some point, Israel. That is not the question before the Court, however. The question is, "where a child is at home, *at the time of removal or retention*[.]" *Monasky*, 589 U.S. at 77 (alterations and emphasis added; citation omitted); *see also Ruiz v. Tenorio*, 392 F.3d 1247,

10

1251 (11th Cir. 2004) (noting petitioner had to prove children were "'habitually resident'" in Mexico at the time the mother removed them to the United States (citation omitted)). Petitioner did not allege an exact date of retention, claiming only that the wrongful retention occurred at some point between the day the family arrived in Miami in October and the day she filed her Petition in February. Due to Petitioner's lack of an exact date, Respondent represents — and Petitioner does not dispute — that the relevant date in question is the day the Petition was filed: February 19, 2024. Taking notice of the unique circumstances here, the Court finds that, on that date, the Children's habitual residence was in Florida.[9]

As explained, the family was transitory for the duration of the Children's lives. Before the family moved to Israel, W.S. had lived in at least three different places and attended multiple schools at just five years of age. The time the family spent in Israel was not continuous, either; the family left each summer and took multi-week vacations away from the country throughout each year. Considering their lifestyle, only a short time was needed for the Children to feel at home back in the United States, and, more specifically, to feel at home in Florida.[10]

The factors outlined in *Monasky* suggest the Children's habitual residence did, in fact, shift to Florida. *See* 589 U.S. at 78 n.3. By February, the Children were all enrolled in school and had local doctors and therapists; the two older children were engaged in activities like soccer, basketball, and Minecraft clubs — all in Florida. They had many belongings in the State, including

---

[9] The parties disagree whether the relevant inquiry is if the Children are at home in the United States as a whole, or specifically in Florida. As the Court determines the Children's habitual residence was in Miami, Florida when the Petition was filed — the narrower of the two options — there is no need to answer the question.

[10] Respondent presented expert testimony from a child psychiatrist that children experience time differently than adults, and it is possible for young children to become accustomed to living in a new place much more quickly than it would be for an adult.

Legos, books, bikes, and scooters. And they had built a thriving social community in Florida. The Court heard testimony from Respondent, Respondent's brother, and Respondent's sister that the Children's paternal aunts, uncles, and cousins either live in the South Florida area or visit frequently. Testimony also revealed that the Children's maternal grandparents owned a home in South Florida at the time the Petition was filed and spent time with the Children at holidays and other events here.[11]

Similarly, while shared parental intent is not dispositive, it is meaningful, particularly for younger children. *See id.* at 78–79. Based on the evidence presented, Petitioner and Respondent had a shared intention of staying in South Florida until the war in Israel was over, or at a minimum from six months to one year. The Petition was filed within six months of the family's move to Miami. This — coupled with the Children's school, toys, extracurriculars, family time, friendships, doctors, and therapists in Florida — convinces the Court that, considering the totality of the circumstances, the Children's habitual residence in February was in Florida.

While the Court's analysis and ultimate finding are based largely on the facts presented at the hearing, the Court finds additional support for its conclusions in caselaw. Courts have noted that a relatively short stay can be sufficient to establish a new habitual residence. *See, e.g.*, *Smith v. Smith*, 976 F.3d 558, 560–63 (5th Cir. 2020) (applying *Monasky* and affirming a finding that, after two years in Argentina followed by a three-month stay in the United States, the American-citizen children's habitual residence was the United States). Courts have also observed that, "after some period of time in the new environment, the habitual residence of the children will change regardless of the parents' hopes to someday return to the prior residence." *Koch v. Koch*, 450 F.3d

---

[11] It also bears noting that the Children are not fluent in Hebrew — which reportedly caused them social and psychological problems in Israel — but are fluent in English.

703, 717 (7th Cir. 2006) (noting that "although residing habitually in a place means that a person has, in some sense, settled there, it need not mean that's where you plan to leave your bones" (citation and quotation marks omitted)).

At bottom, the unique factual circumstances of this case — and Respondent's credible testimony — lead the Court to conclude the *Children's* habitual residence changed to Florida before the Petition was filed, regardless of Petitioner's desire to return to Israel (thereby changing her stated intention to wait until the war was over or be in Miami for six months to a year) and the relatively short duration of the family's continuous stay in the United States at that point. *Cf. In re Ahumada Cabrera*, 323 F. Supp. 2d 1303, 1310 (S.D. Fla. 2004) (explaining that habitual residence is a place "which has a degree of settled purpose *from the child's perspective*" (emphasis added; citation and quotation marks omitted)). Because Petitioner has not shown that the Children's habitual residence was in a foreign country, she has not proven her prima facie case.

***Wrongful retention.*** Having found that the Children's habitual residence is *not* in Israel, there is no retention, much less wrongful retention. Under the Hague Convention, "[t]o establish a prima facie case . . . a petitioner must [] prove that the child is being kept *outside* of his country of habitual residence (the 'retention' aspect)." *De La Riva v. Soto*, 183 F. Supp. 3d 1182, 1190 (M.D. Fla. 2016) (emphasis in original; alterations added; citation omitted). "In other words, the Hague Convention was meant to cover the situation where a child has been kept by another person away from the petitioner claiming rights under the Convention, not where the petitioner still retains the child but is prevented from removing him from the jurisdiction." *Pielage*, 516 F.3d at 1289.

Here, Petitioner has always had physical custody of the Children. While the parties testified that they are currently working out a visitation schedule, it is undisputed that the Children live with Petitioner — as they did when she filed the Petition.

> In cases such as this one, where the child[ren] remain[] in the physical care of the petitioner, it is impossible "to return the child directly to the applicant." That is so because there has been no "retention" within the meaning of the Convention. There having been no retention, there can have been no "wrongful retention."

*Id.* (alterations added; citations omitted). Where an event does not "alter the family and social environment in which [a child] has developed," the result is "not the type of retention that the Hague Convention was intended to remedy." *Id.* (alteration added; citation and quotation marks omitted)).

Even if Petitioner had shown the Children's habitual residence was in Israel, however, the Court would still find there was no wrongful retention. A retention is "wrongful" when "it is in breach of rights of custody attributed to a person, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention[.]" *Berenguela-Alvarado v. Castanos*, 950 F.3d 1352, 1358 (11th Cir. 2020) (alteration adopted; other alteration added; quoting Hague Convention, art. 3).

Petitioner has not shown by a preponderance of the evidence that her custody rights under Israeli law were violated. *See id.* Respondent acknowledged that, prior to the filing of the Petition, he had expressed a preference that the Children not return to Israel. Petitioner's own legal expert testified, however, that neither parent has superior custody rights to determine whether to *change* the Children's habitual residence. As Petitioner's legal expert testified, if Israel was the Children's habitual residence, Petitioner did not need explicit consent from Respondent to return to Israel with them. Respondent's legal expert testified similarly. Consequently, Respondent's expression of disagreement alone did not violate Petitioner's custody rights.

Again, before the hearing, Petitioner claimed Respondent cancelled plane tickets and drained their bank accounts to prevent her and the Children from flying to Israel and maintaining their house there. (*See* Goldstein Aff. ¶ 59). Respondent testified that he had taken no concrete

action to prevent Petitioner or the Children from returning. The hearings bore out Respondent's version of events. Credible testimony showed that Petitioner specifically instructed the parties' travel agent to keep information concerning the reservations of plane tickets to Israel from Respondent. Additionally, Petitioner presented no evidence suggesting that she could not afford to purchase plane tickets with her own funds rather than using funds from the parties' joint account.

Regrettably, "it is frustrating that two competent adults who obviously love their wonderful and well-settled Children cannot work out a rational plan" for addressing their Children's needs. *Soterano v. Aponte*, No. 23-cv-20581, 2023 WL 3790895, at *8 (S.D. Fla. June 2, 2023). The parties' inability to resolve their dispute, however, does not a Hague Convention case make. Because there was no wrongful retention — even assuming the Children's habitual residence was in Israel — the Petition must be denied.

### IV.     CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Petitioner, Brooke Goldstein's Verified Petition for Return of the Children to Israel **[ECF No. 1]** is **DENIED**. The United States Marshal shall **RELEASE** the Children's passports to counsel for Respondent. The Clerk of Court is directed to **CLOSE** the case.

**DONE AND ORDERED** in Miami, Florida, this 13th day of June, 2024.

_____
**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:     counsel of record